UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────────────x

ROBERT KALAJ,

      Petitioner,

  -against-                                    02 Civ. 2963(CM)(MDF)

CHARLES GREINER, Superintendent,
Green Haven Correctional Facility, and
ELIOT SPITZER, Attorney General of
the State of New York,

      Respondent.

───────────────────────────────────────x

MEMORANDUM DECISION AND ORDER ACCEPTING MAGISTRATE
JUDGE'S REPORT, ADOPTING SAME AS THE DECISION OF THE
COURT, AND DISMISSING PETITION FOR WRIT OF HABEAS CORPUS

McMahon, J:

The Court has received the Report of The Hon. Mark D. Fox, United States Magistrate Judge, in which Judge Fox recommends that the petition for a writ of habeas corpus be dismissed. I have also reviewed the objections petitioner lodged to the Report and Recommendation. I accept the Report and I adopt Judge Fox's recommendation that I dismiss the petition, but on the grounds set forth below rather than on those contained in the Report.

**Procedural Background**

A bit of history is in order. Petitioner filed a petition for a writ of habeas corpus in 1999, Kalaj v. Bennett, No. 99 Civ. 2943 (CM)(MDF). Judge Fox prepared a Report and Recommendation recommending that all three of petitioner's claims be denied on the merits. Those claims were (1) the trial court's refusal to admit DNA evidence was an error of constitutional magnitude; (2) the trial court's decision on the motion to suppress evidence

collected during a search of defendant's apartment was an error of constitutional magnitude; and (3) ineffective assistance of counsel.

However, Judge Fox observed that petitioner's ineffective assistance claim had not been exhausted in the state court. Petitioner immediately asked to withdraw the petition without prejudice. I granted that request on January 25, 2001.

Petitioner promptly commenced a proceeding in the Appellate Division: Second Department, seeking a writ of error *coram nobis* on the ground of ineffective assistance of counsel. That application was denied on November 26, 2001, People v. Kalaj, 288 A.D. 2d 492 (2d Dept. 2001). Less than one month later, on December 19, 2001, the instant petition was forwarded to the Pro Se Office, which filed it on Petitioner's behalf in January 2002. The new petition raises a single claim – ineffective assistance of counsel. The other two claims that were raised in the original withdrawn petition appeared to Judge Fox to have been abandoned (and indeed, as will be made clear below, they have been expressly abandoned).

Before addressing the merits, Judge Fox raised, *sua sponte*, the issue of whether the second petition was time-barred under the Antiterrorism and Effective Death Penalty Act (AEDPA).

After petitioner withdrew his original petition and before he filed his second petition, the United States Supreme Court ruled that the one year statute of limitations applicable to federal habeas review under AEDPA did not toll during the pendency of the first habeas proceeding. Duncan v. Walker, 533 U.S. 167 (2001). Petitioner's conviction became final for AEDPA statute of limitations purposes on July 7, 1998, so a petition filed in December 2001 is, on its face, untimely.

2

As a result of <u>Duncan</u>, the practice in this Circuit is now to stay, rather than dismiss, a petition containing some exhausted and some unexhausted claims to permit exhaustion. <u>Zarvela v. Artuz</u>, 254 F. 3d 374, 379-80 (2d Cir.), *cert. denied sub nom* <u>Fischer v. Zarvela</u>, 534 U.S. 1015(2001). Only because I did not anticipate <u>Duncan</u> did I grant the petitioner's request that he be permitted to withdraw the first petition. If <u>Duncan</u> had been on the books in January 2001, I would have denied petitioner's motion but stayed this matter to permit exhaustion.

Petitioner filed his initial petition April 23, 1999, nine and one half months after his conviction became final. When the fact that he had not exhausted his ineffective representation claim was brought to his attention, he moved expeditiously to do so. He filed the instant petition virtually by return of post (within one month) after receiving the Appellate Division's denial of his *coram nobis* petition. In short, petitioner has been exceedingly diligent in prosecuting his claims.

If this law were still as it was in this Circuit prior to <u>Duncan</u>, see <u>Walker v. Artuz</u>, 208 F. 3d 357, 360-61 (2d Cir. 2000), this petition would have been timely. As a result, this is one of the small class of cases to which courts in this Circuit apply the doctrine of equitable tolling, because of a combination of (1) the "rare and extraordinary circumstance" of a change in the law between the time petitioner sought leave to withdraw his petition and the time he filed anew, and (2) petitioner's demonstrated diligence throughout the period he seeks to toll equitably. <u>Rodriguez v. Bennett</u>, 3030 F. 3d 435 (2d Cir. 2002); <u>Leake v. Senkowski</u>, 274 F. Supp. 2d 588 (S.D.N.Y. 2003). Therefore, as Judge Fox did, I conclude that this petition is subject to equitable

3

tolling and is timely filed.[1]

With that I turn to a discussion of the case.

**The Underlying Conviction**

The following overview of the facts of the underlying state court criminal case is taken from the record on appeal and the briefs on appeal that were filed in the Appellate Division: Second Department.

Petitioner was convicted of the crimes of Rape in the First Degree, Criminal Use of a Firearm in the First Degree, Sex Abuse in the First Degree. Assault in the Second Degree (six counts), Unlawful Imprisonment in the First Degree and Assault in the Third Degree. The evidence at trial demonstrated that petitioner, his brother Anton, the victim (Evans) and a fourth individual (Papas) were present in petitioner's apartment in Tuckahoe, New York on April 24, 1994. Anton left the apartment at about 9:45 pm. Papas and Evans left shortly thereafter, but Evans returned to the apartment to wait for petitioner's brother (with whom she had arrived) to return. While in the apartment, she watched the movie Indecent Proposal with petitioner. Petitioner opened up the "pull-out" couch, thus converting it into a bed, shut off the lights and he and Evans lay down on the mattress to watch the movie.

When Anton did not come back, Evans asked if he was returning. Petitioner told Evans that he had beeped his brother but gotten no response. Evans then asked petitioner to drive her home. He told her to wait until the movie was over. Evans picked up the telephone to call a cab

---

[1] Much of petitioner's July 12, 2005 Objection to the Report and Recommendation stems from a misunderstanding of Judge Fox's discussion of the statute of limitations. Petitioner seems to believe that Judge Fox recommended that I dismiss this petition as time-barred. In fact, he did exactly the opposite.

but appellant took the phone from her and told her that cabs were not running in Tuckahoe and that Yonkers cabs could not find his house. When Papas telephoned petitioner's apartment, looking for Evans, petitioner lied, telling Papas that Evans had already left.

When the movie ended, petitioner turned off the television and repeatedly asked Evans why she would not go out with him. Evans said she did not want to and asked petitioner to drive her home. He said he would only if she kissed him. Evans said no and walked away. Petitioner told her to come back into the living room and she did, sitting first on the floor and then on the couch. At that point, petitioner forced Evans down on the couch and began sexually molesting her. He fondled her breasts and vagina through her clothes, took off her jeans, shirt and underwear and ordered her to remove her bra, and inserted his penis into her vagina. At some point he also put his finger in Evans' vagina. When she cried out, he pinned her arms down, punched her in the face and bit her. He also threatened to kill her. During the course of the attack he squeezed her left breast repeatedly, leaving bruises. At the end of the encounter, Evans' face was bruised, swollen and bleeding from visible bite marks. There were also bruises on her breast and hips. Evans asked appellant not to ejaculate inside of her; she could not tell whether he ejaculated or not.

Petitioner threatened to kill Evans and her family if she went to the police. As they left the apartment, petitioner put a gun to Evans' head. During the ride home, he gave the gun to Evans, but only after closing and locking the windows to the car so she could not throw it out of the car. Evans put the gun on the floor of the car, but petitioner demanded that she put it in the waistline of her jeans, because he thought a police car was following them. She returned the gun to petitioner when he dropped her off at her home.

5

For some 30 hours after the incident, Evans lied repeatedly, to the police, to personnel at Yonkers Hospital (where she went for treatment of her injuries) and to members of her family, about what had happened. She told everyone that she had been "jumped" by a gang of girls in a local park. However, on April 26, she went to her job at Key Foods Supermarket, where she spoke to her boss and his wife. They took her to a rape crisis center, where she spoke to a counselor. Thereafter, she went home and told her family what had really happened. Approximately 36 hours after the incident, she went to the Tuckahoe police with her mother and sister, gave a statement to detectives and permitted them to photograph her injuries. She also gave the detectives a bag into which she has put her clothes when she took them off on the night of the incident.

After talking to the police, Evans was re-examined at Lawrence Hospital, where a rape kit was prepared. While she was at Lawrence, she made statements about her sexual activity during the preceding 72 hours. Evans was subsequently examined by a specialist in forensic odontology, who examined the bite marks on her face. She also went to a gynecologist at Planned Parenthood, who examined her and found no evidence of vaginal or abdominal injury.

Petitioner was arrested and Mirandized at his apartment at approximately 6 PM on April 26. The police obtained his gun at that time. Pursuant to a search warrant, the detectives later obtained petitioner's mattress, bedding and some of his clothing.

At the trial, in addition to the testimony of Evans, Papas, the police officers who responded to her initial report about being "jumped" in the early morning hours of April 25 and the Tuckahoe police to whom she spoke the next day, and personnel from Yonkers and Lawrence Hospitals, the People introduced the testimony of Ted Pool, a forensic scientist at the

Forensic Laboratory of the Department of Laboratories and Research in Valhalla. Pool was qualified as an expert in the field of DNA forensic analysis. He testified that he received blood exemplars from both petitioner and Evans in September 1994. He also received and examined stains on Evans' underpants, her jeans and on the sheet and mattress pad from petitioner's bed. Pool tested these materials using a method known as "Restriction Fragment Length Polymorphism" (RFLP), which generated ten autoradiographs. By comparing the autoradiographs, Pool concluded that the DNA on Evans' underpants matched petitioner's DNA as collected from his blood sample and his bedding. Pool testified that there was a 1 out of 9.1 million chance that another, unrelated Caucasian male could have been a DNA match with the DNA from the stain on Evans' underpants, and there was a 1 out of 1,024 chance that a related Caucasian male could have been a match.

Pool testified that he had asked for samples of blood, saliva, head and pubic hair from petitioner's brother, but never received them and so had not been able to exclude the possibility that Anton Kalaj's DNA profile matched petitioner's. However, Pool said that the integrity of his conclusions were in no way affected by his inability to examine exemplars from the brother.

On petitioner's case, his counsel elicited the fact that Anton (petitioner's brother) and Papas had driven to petitioner's apartment; that Evans beeped Papas and asked to join the group; that Anton went to fetch her in his car; that he picked her up at about 8:30 and arrived at petitioner's apartment at 9:15; that shortly after Evans arrived, Anton was beeped by friends and left his brother's apartment. Anton testified that he ignored a page from his brother at 10 PM, answered a second page, and returned to his brother's apartment at 10:45 for the purpose of driving Evans home. Anton testified that he beeped the horn and Evans emerged from the

apartment, without any visible bruises, and got into his car. Anton testified that he and Evans argued on the way home and that she "rampaged out the car" before 11:30 pm, which is when petitioner's brother arrived at his own home in Yonkers.

In summation, petitioner's lawyer argued that Evans was not raped or sexually assaulted. He argued that Evans' testimony about Kalaj was incredible, while her initial story about being assaulted by a gang of girls was consistent with the injuries she suffered, none of which were gynecological. Counsel argued that Evans made the rape story up because she was angry with petitioner and his brother and because she was afraid that her mother would be angry that she had been out on the streets after midnight on a school night. He urged the jury to find Pool's testimony unreliable because he did not compare the semen to Anton's and was thus unable to exclude petitioner's brother as a source of the semen.

Petitioner's counsel did not argue that Evans consented to any sort of sexual activity with petitioner, or that petitioner had any form of sexual congress with Evans. Thus, there was no "consent defense."[2]

The jury convicted petitioner on all counts.

**The Excluded Testimony**

The trial court excluded two lines of testimony that bear on the instant habeas.

*The Testimony of Petitioner's Brother*

Petitioner proffered that Anton would have testified that he had consensual sexual intercourse with Evans during the period after he picked her up at her apartment and before they

---

[2] The term "consent defense" is a misnomer. Under New York's Penal Law, lack of consent is an element of the crimes of forcible rape and sexual abuse. Therefore, the People must prove lack of consent beyond a reasonable doubt.

arrived at petitioner's apartment. Petitioner also sought to prove that Evans had an ongoing sexual relationship with both petitioner and his brother prior to the incident about which she complained. This evidence – as well as cross-examination of Evans about any sexual contact she may have had with Anton – was excluded under New York's rape shield law, CPL § 60.42.

Petitioner sought to have the testimony admitted pursuant to two exceptions to the rape shield law's general prohibition on testimony about a victim's sexual history. The first is CPL §60.42 (4), which permits testimony if offered "to rebut evidence introduced by the People which proves or tends to prove that the accused is.....the source of semen found in the victim." Since the semen in this case was not found "in" the victim, but on her clothing, CPL § 60.42(5), the "interests of justice" exception, was invoked as well. In either case, petitioner's goal was to rebut the contention that he was the course of semen found on petitioner's clothing.

However, when arguing against the rape shield motion, petitioner's attorney advised the court that "the sexual activity in this particular matter was on consent." (Tr. 62). Counsel further represented to the trial court that he planned to open to the jury with a consent defense. (Tr. 63) The trial court did not preclude questioning about the victim's alleged sexual relationship with petitioner, since it was relevant to the issue of consent (Tr. 24-41).

Having told the trial judge that he would argue consent, petitioner's counsel sought permission to present evidence that petitioner's brother had sex with the victim hours before the alleged rape. (Tr. 230-33) The trial judge precluded questioning either Evans or Anton about this issue, saying, "The principal defense" is consent and there is "no issue...as to the identity of the

9

person who had sexual relations with the victim." (Tr. 239-40)³ Because the trial court understood that petitioner would argue that the he had engaged in consensual sex with Evans, the judge concluded that evidence about sex she may have had with petitioner's brother was being offered to tarnish the victim's reputation.

Defense counsel repeatedly reargued this ruling, but it was repeatedly reaffirmed. (See Tr. 448, 450-51; 1313-20; 1621-35; 2235-44) At no time during any of these arguments did defense counsel abandon the issue of consent.

*The Testimony of Dr. Holub*

Petitioner also proffered testimony from a Dr. William Holub, who was qualified as an expert in the field of clinical biochemical techniques. Holub was proffered to testify to inadequacies in the People's technique of DNA analysis, despite what the People contended were inadequate credentials. As I understand it, the witness was proffered to demonstrate that the DNA testing in the case "means nothing," whether it pointed to petitioner or to his brother as the source of the semen. (Tr. 67-7) At another point, counsel for defendant indicated that he intended to prove that DNA testing did not exclude the brother as the source of the semen.(Tr. 230-35)⁴

The People repeatedly objected to Holub's testimony. Eventually, after listening to him testify about such matters as the importance of testing samples before they degraded (which he

---

³ Defense counsel had conceded that Evans could identify her assailant, as this was not a case where any stranger was allegedly involved.

⁴ The tremendous disparity between the 1 in 9.1 million chance that the DNA in the semen could have belonged to a Caucasian male unrelated to Petitioner and the 1 in 1,029 chance that it could have belonged to a Caucasian male related to Petitioner means, of course, that petitioner could make this argument without introducing his own expert testimony – which petitioner did, in his closing argument.

10

undercut by admitting that he knew nothing about the time frame of the testing in the case) and about the validity of comparing DNA obtained from a semen stain on the victim's underpants with DNA obtained from petitioner's blood (which Holub opined was problematic because it was important to "compare apples to apples"), the court excused the jury, took argument and ultimately reversed its ruling permitting Holub to testify as an expert. The court noted that Holub himself "....would not say that he was such an expert [in DNA testing]" and ruled, "It now appears that this man has the most minimal qualifications about RFLP to render any opinion on this subject." (Tr. 2536) During a later colloquy, the trial court noted that, while Holub – who characterized himself as a "renaissance scientist" (Tr. 2472) – had "been in all kinds of fields of science...his contact with DNA is almost nonexistent, and his knowledge of RFLP, and he had trouble remembering what it was, is so minimal that to make him an expert on DNA in this case is a real stretch." (Tr. 2541-42)

**Post-Conviction Proceedings**

On appeal, petitioner argued that the trial court improperly excluded his brother's testimony. The Appellate Division rejected his contention as a matter of New York law:

> Further, the court properly precluded the defendant from cross-examining the complainant, or eliciting testimony from the defendant's brother, about the brother's alleged sexual encounter with the complainant prior to the rape in order to establish a possible source of the semen recovered from the complainant's clothing. Pursuant to CPL 60.42, evidence that the complainant engaged in sex with another is admissible under the interest of justice provision to establish the source of the semen recovered [citations omitted]. Here, however, the defendant, when making h his offer of proof, conceded that he engaged in sexual relations with the complainant, rendering evidence of the source of the semen irrelevant. The admission of such evidence would be inconsistent "with the legislative purpose of barring harassment of victims of sexual crimes concerning irrelevant issues and of shielding the jury from confusing and prejudicial matters which have no bearing on the issue of the guilt or innocent of the

11

[defendant]" [citations omitted].

People v. Kalaj, 247 A.D. 2d 663 (2d Dept. 1998). The Appellate Division rejected petitioner's other argument relating to the exclusion of the "rape shielded" testimony on purely procedural grounds:

> The defendant's belated contention that such evidence was admissible because he was entitled to proffer inconsistent defenses is unpreserved for appellate review (see, CPL 470.05[2]). In addition, this claim is not properly before this court since it was raised for the first time in the defendant's reply brief (see, People v. Ford, 69 NY2d 775,777).

Id.

Petitioner also argued on appeal that the trial court erred in refusing to permit Dr. Holub to testify. This contention the Appellate Division rejected summarily, but on the merits, when it did not specifically discuss the issue but simply stated, "The defendant's remaining contentions are without merit." Id.

The Court of Appeals denied leave to appeal. People v. Kalaj, 92 NY2d 880 (1998).

**The Original Petition**

In the first petition Kalaj filed pursuant to 28 U.S.C. § 2254, he asserted three claims of constitutional error: (1) that his conviction was constitutionally flawed simply because of the trial court's refusal to admit evidence concerning the brother as the alternate possible source of the semen; (2) that his conviction was constitutionally flawed because petitioner's apartment was searched without probable cause; and (3) that his conviction was constitutionally flawed because of ineffective assistance of counsel.

Magistrate Judge Mark D. Fox, to whom the matter was sent for Report and Recommendation, recommended, in an extensive Report, that the first two claims be dismissed

on the merits. He also recommended that the ineffective assistance claim be dismissed on the merits, but noted that this claim had not been exhausted in the state courts.

Instead of filing objections, petitioner asked for permission to discontinue his original proceeding voluntarily, so he could exhaust his ineffective assistance claim. As noted above, that request was granted.

**The Instant Petition**

The instant petition asserts a single claim, for ineffective assistance of counsel. The factual basis for this claim has to do with the preservation (or lack of preservation) of the "inconsistent defenses" issue at trial. As can be seen above, the Appellate Division ruled was not raised in the trial court.

It bears noting that petitioner has expressly abandoned any claim other than this single claim of ineffective assistance of counsel. Judge Fox presumed that he had done so (See Report at 3), but any doubt on that score is eliminated by his Objections to Judge Fox's Second Report and Recommendation. Judge Fox's Second Report repeats in considerable detail much of the discussion from the First Report, even though Judge Fox concluded that the new petition had abandoned most of the claims made in the first petition. Petitioner objects to all of that discussion, which he deems extraneous and prejudicial. In his objection to that Report, petitioner says quite clearly, "Again, the only issue before this court is ineffective assistance of counsel." (Objection at 12). [5]

---

[5] Petitioner is quite correct that some of the learned Magistrate Judge's lengthy exegesis on issues that are no longer in the case was unnecessary and has complicated review of the matter. For example, Petitioner no longer contends that the trial court's refusal to admit this evidence constituted a constitutional violation. However, because of the intertwining of the evidentiary issue discussed above with the lone ground for ineffective assistance asserted in the

13

If the scope of the instant proceeding is clear, the precise theory being pursued by petitioner is somewhat garbled. Petitioner makes an ineffective assistance of *appellate* counsel claim. But his argument is that, "appellate counsel *was unable* to brief the issue of his rendering ineffective assistance as trial counsel by failing to preserve, for appellate review, the trial court's denial, of allowing inconsistent defenses, and a result of this denial, a complete defense to the charges contained within the indictment." (Brief in Support of Petition at 7)(Emphasis added). [6]

Appellate counsel (who was also trial counsel) was not "unable" to brief this issue on appeal – and in fact he did brief this issue on appeal. What Attorney Gargano was "unable" to do was convince the Appellate Division to consider this "belated contention" on the merits, because the argument had not been preserved below. For this reason, petitioner's real claim is one of ineffective assistance of *trial* counsel, and I will treat it as such.[7]

---

petition, some discussion of the trial record was assuredly in order. And since his claim of ineffective assistance is analyzed pursuant to the Strickland standard (see infra), a discussion of the evidence against him cannot be avoided here.

[6] Just to get an extraneous issue out of the way: the trial court's refusal to admit the expert testimony is not implicated by this alleged instance of ineffective assistance. The only reason defendant's proposed expert testimony concerning the DNA testing was not admitted because the trial court concluded that the witness was not qualified to offer the opinions he proposed to give. Exclusion of defendant's expert testimony was not predicated on any "inconsistent defenses" analysis. Not only was the trial judge prepared to permit testimony by a defense DNA expert, but he allowed Holub to take the stand, deemed him to be an expert in a limited area and permitted him to testify before the jury until his lack of qualifications on issues deemed relevant became clear. In any event, trial counsel clearly preserved the expert witness issue for appeal (Tr. 2538) and it was briefed and dealt with on the merits. There can be no ineffective assistance claim on that score.

[7] Counsel briefed the "inconsistent defenses" issue for the first time on reply, and the Appellate Division noted this as a separate and independent procedural ground for not entertaining the issue. Had the issue been preserved below, counsel's failure to brief it in his opening brief might have afforded petitioner a ground for a claim of ineffective assistance of appellate counsel. However, because the issue was not preserved at trial, the question of which brief finally raised it is immaterial; the Appellate Division was precluded as a matter of law from

14

**The Petition Must be Dismissed Because Petitioner
Fails to Meet *Both* Prongs of the <u>Strickland</u> Test**

To demonstrate constitutional ineffectiveness, a petitioner must show two things: first, that counsel's performance was in fact deficient; and second, that the deficient performance prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). Counsel's performance is deficient when it falls below the generally accepted standard of representation. Prejudice means that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Lindstadt v. Keane</u>, 239 F.3d 191, 204 (2d Cir. 2001). The burden of proving ineffective assistance rests with petitioner.

Judge Fox concluded that the ineffective assistance issue raised by petitioner was but a complaint about a failed strategy, and declined to rule that counsel's performance was ineffective because matters of strategy that fail are not judged with the benefit of hindsight. But I disagree that this is a backward look at a failed strategy. Apparently, as to the lesser sexual abuse charges, trial counsel planned to argue, in the alternative, that Evans consented to the sexual encounter. There was some evidence to support such an argument.[8] But as to the highest charge – Rape in the First Degree, which has as one of its elements sexual intercourse – trial counsel planned to argue (and did argue) that petitioner did not have sexual intercourse with the victim.

---

considering it, period. The reference in the opinion to the Reply Brief is essentially gratuitous.

[8] As set forth in Petitioner's Reply Brief on Appeal (at 3-4), one could argue that certain aspects of Evans' testimony were consistent with consent to various acts of sexual touching (and even to sexual intercourse, although that apparently was not counsel's strategy): Evans voluntarily returned to petitioner's apartment and remained with him by herself; she reclined on the open sofa bed with petitioner while watching the movie <u>Indecent Proposal</u>; she remained on the sofa bed after petitioner removed his shirt; and (at least as viewed from petitioner's perspective) she gave him permission to remove his pants, so that he was wearing only his boxer shorts when he got back onto the sofa bed with her.

15

There is absolutely no question that trial counsel said nothing – nothing at all – to apprise the trial court that petitioner intended to present this sort of "dual" defense.[9] Indeed, the last time the court was asked to reverse itself on the admissibility of the brother's testimony, which was just before Anton testified, the judge expressed exasperation that the defense appeared to be changing from "consent" to "whodunit." This would have been the correct time for petitioner's counsel to explain to the court its strategy of denying intercourse but admitted other sexual activity and arguing consent as to that activity.

Of course, as counsel protested in the Reply Brief to the Appellate Division, a defense lawyer is not required to tip its hand in advance. But neither is the court required to intuit why evidence might be relevant when at first blush it seems, not only irrelevant, but highly prejudicial in a way that is inconsistent with New York law and public policy. Once the court ruled against defendant's attempt to get the issue of intercourse with Anton before the jury, and refused to budge from that ruling time and time again, it became incumbent on counsel to explain to the judge why the "consent defense" did not bar introduction of this evidence. Counsel proffered that explanation quite cogently in his Reply Brief in the Appellate Division – he argued that the consent defense would only have been put forward as to the counts of sexual abuse, not rape – but that was far too late. He should have made that argument to the trial court. His failure to do so falls below any generally accepted standard of representation, and so is

---

[9] This issue has been described by petitioner, and was described by counsel on appeal, as one of the right to present "inconsistent defenses." But there is nothing inconsistent about the defenses when consent is only the defense as to lesser charges of sex abuse involving a fondling or foreplay, while "I never had sexual intercourse with that woman" is the defense to the charge of Rape in the First Degree.

16

"deficient" under the first prong of the Strickland standard.[10]

However, the Strickland standard is two-pronged, and petitioner has utterly failed to convince this court that, but for counsel's error, there is a reasonable probability that he would not have been convicted. A review of the record reveals that there is no probability whatever that petitioner would have been acquitted, even if the jury was told that Anton Kalaj had intercourse with Evans between 8:30 and 9:15 on April 24. Both the DNA evidence and the other evidence made conviction all but inevitable. And making the "inconsistent argument" now propounded by petitioner only increases the likelihood of conviction on the highest charge – Rape in the First Degree (forcible rape).

Aa to the DNA evidence: Pool, the People's expert, testified – without contradiction by any *qualified* expert – that the sperm on her panties matched Robert Kalaj's to a high degree of certainty. He also testified that there was only a 1 in 1,029 chance that a male related to Robert Kalaj could be the sperm's source. While that is far less than the probability that an unrelated male was the source of the sperm, it still makes Anton a highly unlikely source, especially because the rest of the evidence pointed squarely to the conclusion that petitioner forcibly raped Evans. Even though Pool admitted that he could not exclude Anton absolutely, he was able to opine that there was an extremely low probability that petitioner's brother, or any of his other

---

[10] Were the record otherwise, I might have agreed with Judge Fox that this was a case of failed strategy. It is possible that counsel declined to tell Judge Lange that he would not argue consent because he had already told the trial judge he was going to argue consent – and had thereby obtained a favorable ruling permitting him to cross-examine Evans about her sexual history with petitioner. Counsel might have concluded, as a matter of strategy, that it would be unwise to retreat from that position. But there is no affidavit in the record from petitioner's lawyer, and thus no evidence about what strategic decisions he made. Since I can dispose of this petition on other grounds, there is no need for me to supplement the record by holding a hearing to obtain the testimony of Attorney Gargano.

relatives, was the source of the semen. This gave the jury ample reason to accept the People's argument that petitioner's sperm, and no one else's, was in Evans' panties.

The DNA evidence implicating petitioner is bolstered by other evidence, notably the evidence of petitioner's extensive injuries. Evans' physical injuries were extensive, including bruises and bites to her face, bruises on her breast and bruises on her hip. The witness from Yonkers Hospital and the Yonkers Police, who saw the victim in th early hours of April 25, an hour or two after the attack, observed and documented the injuries, which were both apparent and of recent origin (Evans was still bleeding). The injuries - particularly the bruises on the breast and bites on the face – are completely consistent with resistance to some sort of sexual attack and not consistent with a beat down in the park. Neither Anton nor Papas testified that Evans's face was cut and bruises and bitten when she arrived at petitioner's apartment, so the injuries had to have been inflicted after Anton and Papas left the apartment. The only two people in the apartment at that point were Evans and petitioner. The forensic odontologist testified that the teeth marks on Evans' face – still visible at the trial, which was months after the attack – matched Robert Kalaj's dental profile. In short, the evidence points overwhelmingly to petitioner as the person who inflicted these injuries on Evans.

Finally, such physical injuries would not logically have been inflicted during a consensual sexual encounter. This means arguing that Evans consented to foreplay would actually make it *more* likely, not less likely, that a jury would convict petitioner of forcible rape.

Judge Fox questioned whether petitioner's counsel ever really intended to argue that Evans consented to a sexual encounter with Robert Kalaj. I can understand why. In view of the totality of the evidence, petitioner's strongest argument had to be the on counsel made, ably and

totality of the evidence, petitioner's strongest argument had to be the on counsel made, ably and eloquently, in summation – that Evans's initial story to the police was true; she was badly beaten by a group of girls in the park; and she made up the story about the rape to get back at the Kalaj brothers (with whom she was angry) and to avoid problems when her mother found out that she not been home on a school night. The jury rejected this completely logical argument. It is highly unlikely that the same jury would have accepted a completely illogical argument based on the so-called "inconsistent defense" that petitioner was prevented from asserting.

Because petitioner has not even come close to satisfying the second prong of the Strickland test, the petition must be dismissed.

As Petitioner has made no substantial showing of the denial of a constitutional right, there is no question of substance for appellate review. Therefore, no certificate of appealability shall issue. 28 U.S.C. § 2253; see United States v. Perez, 129 F. 3d 255, 259-60 (2d Cir. 1997); Lozada v. United States, 107 F. 3d 1011 (2d Cir. 1997); Rodriguez v. Scully, 905 F. 2d 24 (2d Cir. 1990). I certify, pursuant to 28 U.S.C. § 1915(a), that an appeal from this order would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962).

Dated: October 25, 2005

_____
U.S.D.J.